## STATE *vs.* THERIAULT.

Heard January Term, 1898.—Decided May Term, 1898.

Present: Ross, C. J., Taft, Rowell, Tyler, Munson, Start and
Thompson, JJ.

*V. S. 4562, 4565, 4567, 4568—Constitutional Law—Police Power to Regulate
—Rights of Riparian Owners—Public and Private Waters.*

A statute which authorizes the fish and game commissioners, when they
place fish in a pond or stream, to prohibit fishing therein, or in specified
portions thereof, for a period not exceeding three years, and provides
that waters when so stocked shall be treated as public waters, subject to
the right of the land owner to make them a "private preserve" or
"posted waters" at the end of five years after filing with the commis-
sioners notice of his intention so to do, is not unconstitutional as taking
private property for public use without compensation, but is a reasonable
exercise of the police power of the State to preserve and increase the
common property.

By declaring that such waters should be public waters, the legislature did
not intend to make them open and free to the public, but only to leave
them without the special protection of posted waters, and to leave the
owner to his common-law action of trespass against intruders.

One has an exclusive right to fish in waters, not boatable, flowing through
his land, and this right is private property and he may maintain trespass
against any one who enters upon his land to fish without his license;
but riparian owners above and below are entitled to have the stream
remain a passageway for fish, and the State may regulate the time and
manner in which his right of fishing shall be exercised so as to subserve
the common good.

The right to post private waters and thereby subject trespassers to a special
penalty, was given by the statute and by the statute could be taken
away.

The statutory definition of public waters apparently excludes from the
jurisdiction of the State private preserves and posted waters; but this is
not true, since both remain subject to the police power.

COMPLAINT for illegal fishing. Heard on demurrer to the
complaint in the city court of Montpelier, January 6, 1898.
Demurrer overruled. The respondent excepted.

*John H. Senter* for the respondent.

The statute is unconstitutional for it amounts to a taking of private property for public use without compensation. It authorizes the commissioners to take possession of non-boatable private streams and, by stocking, posting and advertising, convert them into public waters, in which there will exist the same general public right of fishing as in boatable waters.

In *New England Club* v. *Mather*, 68 Vt. 338, it was expressly held that the State had no jurisdiction over any waters, in respect to fishing therein; save those over which it was retained by virtue of the constitutional reservation as to "boatable and other waters not private."

*F. A. Howland*, State's Attorney, and *F. L. Fish*, for the State, cited 1 Bish. New Cr. Law § 1130; *People* v. *Bridges*, 142 Ill. 30; *State* v. *Lewis*, 134 Ind. 250: 33 N. E. R. 1024; *Gentile* v. *State*, 29 Ind. 409; *Phelps* v. *Racey*, 60 N. Y. 10; *State* v. *Randolph*, 1 Mo. App. 15; *People* v. *Collison*, 85 Mich. 105; *Com.* v. *Chapin*, 5 Pick. 199; Angell on Watercourses, § 65 a; *State* v. *Roberts*, 59 N. H. 256 and 484; *Sawyer* v. *Wood*, 59 N. H. 347; Randolph on Em. Domain, § 430; *State* v. *Boone*, 30 Ind. 225; *Com.* v. *Look*, 108 Mass. 452; *Com.* v. *Vincent*, 108 Mass. 441; *Vinton* v. *Welsh*, 9 Pick. 87; *State* v. *Blount*, 85 Mo. 543; *State* v. *Beal*, 75 Me. 289; *Maney* v *State*, 6 Lea (Tenn.) 218; *Magner* v. *People*, 97 Ill. 320; *Com.* v. *Gilbert*, 160 Mass, 157; *Com.* v. *Essex Co.*, 13 Gray, 247; *State* v. *Snover*, 42 N. J. L. 341; *Doughty* v. *Conover*, 42 N. J. L. 193; *Commissioners* v. *Holyoke Power Co.*, 104 Mass. 446; *Holyoke Power Co.* v. *Lyman*, 15 Wall. 500; *Lawton* v. *Steele*, 152 U. S. 133; Tiedman on Police Reg. 451; *Com.* v. *Alger*, 7 Cush. 84; *License Cases*, 5 How. 583; *Munn* v. *Illinois*, 94 U. S. 113; Cooley, Cons. Lim. 717.

Ross, C. J.   The respondent excepted to the judgment of the city court of the city of Montpelier holding, on demurrer, the complaint of the state's attorney sufficient. The complaint is in three counts. They all charge him with illegally fishing in a stream known as Hale's brook on land owned

by George Hale in the county of Washington, which brook flows into the Winooski river, a boatable stream. Each count alleges that the brook had been stocked with trout by the fish and game commissioners, and duly posted and advertised agreeably to V. S. 4568. The first count alleges that this was done with the consent of George Hale, the owner of the land over which the brook flows. The other two counts do not allege any such consent.

V. S. 4568 reads: "When the fish and game commissioners place fish in a pond or stream, they may prohibit fishing therein, or in specified portions thereof, for a period not exceeding three years, by posting notices to that effect conspicuously upon the banks thereof, and publishing such notice three weeks successively in a newspaper published in the county where such waters are located; if a person fishes, or attempts to fish, in such waters within the time specified, he shall be fined fifty dollars, if prosecution is commenced within six months after the offence is committed." V. S. 4567 reads: "Waters stocked by the fish and game commissioners shall thereafter be treated as public waters, but any person who might otherwise make the same a private preserve or posted waters, may do so at the expiration of five years from the date of filing, with the fish and game commissioners, a written notice of his intention so to do." By V. S. 4565, the fish and game commissioners are authorized, at the expense of the State, among other things, to introduce trout, shad, salmon and other good varieties of fish into such streams, lakes and ponds within the State, not private preserves or posted waters, as they deem suitable to the successful cultivation of fish. V. S. 4562 defines "private preserve," "posted waters," and "public waters," as follows: "Private preserve; a natural pond, of not more than twenty acres, belonging to a common owner, or any artificial pond made solely for the purpose of fish culture." "Posted waters; all waters on lands posted as provided in this chapter." "Public waters; all waters of which the

State has jurisdiction, except private preserves and posted waters." Elsewhere in the same chapter it is provided that the owner or occupant of enclosed or cultivated land may, by posting notices as thereby required, prohibit shooting, trapping or fishing thereon, under a prescribed penalty. These are the main provisions of the statute bearing upon the section brought under consideration. There are provisions establishing a "close season" for hunting and fishing, or a time in the year when all persons are prohibited from hunting and fishing, and also regulating the manner and means by which hunting and fishing shall be prosecuted in the open season. These statutes express the legislative will regulating the rights of riparian owners in regard to taking fish from a common stream, and make the fish and game commissioners officers to carry that will into execution. This is shown by the decision hereinafter cited, and and by all authorities. The respondent does not contend otherwise.

The respondent contends that V. S. 4568 is unconstitutional, in that it deprives the owner of the land over which the brook flows of his exclusive right to catch fish therein for the period of three years, and then make them public waters for at least five years longer, without compensation. This is his only contention. Without considering whether the respondent, being a stranger to the right to fish in this brook, can raise this question, we will pass to the consideration of the broader question, which alone has been argued, whether the statute is unconstitutional as regards the owner of the soil, to whom the right to fish attaches. There can be no doubt, that, if this deprivation of the owner of the soil over which the brook flows of the right to fish in it, for the time specified, is the taking of private property for public use, the law must, as to him, be held unconstitutional.

Article 2, chapter 1, of the constitution of Vermont provides, "That private property ought to be subservient to public uses when necessity requires it, nevertheless, when-

ever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." If the act infringes this constitutional provision, the legislature had no authority to enact it, and it is without legal validity. But this provision of the constitution must be read in connection with its other provisions, and especially must be considered with article 5, chapter 1, of the constitution of Vermont, which declares: "That the people of this state, by their legal representatives have the sole, inherent, and exclusive right of governing and regulating the internal police of the same;" and section 40 of chapter 2 of the constitution of Vermont, reading: "The inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they hold, and on other lands not enclosed; and in like manner to fish in all boatable and other waters (not private property) under proper regulations to be hereafter made and provided by the General Assembly." Hence, the question for consideration is, whether the act of the fish and game commissioners, definitely and specifically authorized and performed by and under V. S. 4568, is a taking of a right belonging to the owner of the land over which the brook flows, for the use of the public; or whether it is a regulation of his use of that right, under section 40 of chapter 2 of the constitution of Vermont, and an exercise of the right of governing and regulating the internal police of the people of the State, reserved to their representatives by article 5, chapter 1, of the constitution of Vermont.

In considering this question, it is necessary to keep in mind the nature of the right and of the property out of which it arises. The right to take fish from flowing waters, not boatable, in this State, pertains solely to the owner of the land through which such waters flow. It pertains to such owner personally and is his private right; but he does not own such flowing water and only has the right properly to use it while on its passage. He can use it in a reasonable

manner for domestic purposes, for creating power, and for taking fish therefrom. He must not divert it from its course, nor pollute it, but leave it so that the land owners on the stream above and below him can enjoy their full like use of the water, and among these, the right to take fish from the stream. This right implies and carries with it the common right to have fish inhabit and spawn in the stream. For this purpose they must have a common passage-way to and from their spawning and feeding grounds. Fish themselves are *feræ naturæ*, the common property of the public, or of the state, in this country. From this common property, the owner of the soil over which the non-boatable stream flows has the right to appropriate such as he may capture and retain; but this right of capture and appropriation is subject to regulation and control by the representatives of the people, so that there shall continue to be a common property. The preservation of the common property, and its increase by the introduction of new and better species of fish, is not a taking away of the right of the owner of land on the stream to appropriate therefrom, but a preservation or enlargement of such right. The State, the representative of the people, the common owner of all things *feræ naturæ*, not only has the right, but is under a duty, to preserve and increase such common property. Such is declared to be the duty of the representatives of the people in the articles and sections of the constitution of Vermont referred to. Such, also, was the common-law view of the nature of the rights of persons in streams and in animals *feræ naturæ*. Says Mr. Justice Blackstone, in his Commentaries, book 2, p. 14: "But after all, there are some few things, which, notwithstanding the general introduction and continuance of property, must still unavoidably remain common; being such wherein nothing but an usufructuary property is capable of being had; and, therefore, they still belong to the first occupant, during the time he holds possession of them, and no longer. Such (among

others) are the elements of light, air and water; which a man may occupy by means of his windows, his gardens, his mills, and other conveniences; such, also, are the generality of those animals which are said to be *feræ naturæ*, or of a wild and untamable disposition; which any man may seize upon and keep for his own use or pleasure. All these things, so long as they remain in possession, every man has a right to enjoy without disturbance; but, if once they escape from his custody, or he voluntarily abandons the use of them, they return to the common stock, and any man else has an equal right to seize and enjoy them afterwards." The same writer treats more fully of this class of common property and of the rights of individuals therein in chapter 25 of the same book, and there lays down the principle, that an individual may acquire or have a qualified property in such animals, among which fish are classed, either because of his industry in capturing and retaining them, or on account of their inability, for the time being, to escape from his premises or control, like young game birds while in the nest, or on account of his special right or privilege of capturing and killing them in exclusion of other persons. This latter right does not exist in this country, except as limited by ownership of the place from which they are taken and the right to exclude others therefrom.

Not a decision in this country, state or national, has been brought to our attention by the respondent, nor by quite an extensive examination of such cases, which holds that such acts of the state legislature, in regard to this class of property and in restraint of the right of the riparian owner to take and appropriate fish therefrom, are unconstitutional. They have uniformly been held to be not a taking of private property or private rights for public use, for which compensation must be made, but an exercise of the police power of the state to preserve or increase a common property, and to regulate the right to capture and appropriate therefrom so as to preserve and increase the

common property, or, at least, to prevent its diminution or destruction.    Many cases might be cited in support of what has thus far been said.    I quote from but a few.    In *Peters* v. *State of Tenn.*, 33 L. R. A. 114, the plaintiff in error owned a tract of land covered by water, from which he alone had the right to take fish.    The water was not a stream through which other riparian owners had the right to have fish pass to and from their feeding and spawning grounds.    An act limiting his right to take fish therefrom only with rod or line was held constitutional, the court saying: "Fish in streams or bodies of water have always been classed by the common law as *feræ naturæ*, in which the riparian proprietor or owner of the soil covered by the water, even though he may have the sole and exclusive right of fishing in said waters has, at best, but a qualified property, which can be rendered absolute only by their actual capture, and which is wholly divested the moment the fish escape to other waters.    Two Bl. Com. 392; *People* v. *Bridges*, 142 Ill. 30; 16 L. R. A. 684.    But, in addition, the power of the legislature to enact laws for the protection and preservation of game in the forest, and fish in the waters of the state, has been so frequently exercised, and when challenged on constitutional grounds has been so uniformly maintained, that the question has now passed beyond debate.    *Maney* v. *State*, 6 Lea. 218; *Lawton* v. *Steele*, 152 U. S. 133; 38 L. C. P. ed. 385; *Magner* v. *People*, 97 Ill. 320; *People* v. *Bridges, supra*; Tiedman on Pol. Powers, §§ 125, 127."    See, also, *State* v. *Mrozinski*, 27 L. R. A. 76; *State* v. *Lewis*, 20 L. R. A. 52; *Ex parte Maier* and note, 103 Cal. 476; 42 Am. St. 129; Fish and Fisheries, 7 Am. and Eng. Enc. of Law 23; *State* v. *Roberts*, 59 N. H. 256; *Trout and Salmon Club* v. *Mather*, 68 Vt. 338; *Drew* v. *Hilliker*, 56 Vt. 641.    *Lawton* v. *Steele, supra*, establishes the attitude of the supreme court of the United States in regard to the constitutionality of such laws, and that they are but police regulations within the powers of the states to exercise.

*Townsend* v. *State*, 37 L. R. A 294, is an interesting case upon the right of a state to enact a law regulating the use of natural gas. It treats it as common property, from which those who strike a vein upon their own lands have a right to draw, but subject to such statutory regulations as the law-making power of the state might enact in the exercise of its police power.

The police power extends to almost all kinds of property and rights, and its exercise by the legislative branch is almost unlimited, except where taken away, or limited, by the state or national constitution. Courts and law writers have not attempted to define it with precision. It is the general power of the legislative branch to enact laws for the common good of all the people. All property and all rights are held in subjection to the exercise of this power, because all individual property and individual rights in every organized community are connected with, and related more or less intimately to, the individual property and individual rights of others. In the exercise of this power, criminal laws are enacted, laws relating to the support of the poor, to the education of the young people, to build and maintain highways; and, to accomplish these ends, the individual is often compelled to surrender a portion of his rights to property and sometimes his liberty.

In *Livermore* v. *Jamaica*, 23 Vt. 361, this court held that the taking of one's land for a public highway was not such a taking as required money compensation to be made therefor under the constitution, but that the benefit which he derived from the establishment of the highway might be offset to the damage he sustained from the taking. The court say: "The constitution is the paramount law of the land; and every statute, which is in contravention of the constitution, must be held inoperative and void. Whether the statute, or that section of it by which the commissioners were governed in making their appraisal, is repugnant to the constitution, must, we think, depend upon whether the

*40*

taking of land for a highway is such an appropriation of the property to public use, as is contemplated by the constitution. The taking of land for a highway does not divest the owner of his title in fee. The public only acquire an easement, and the right of the owner to use, occupy and control the land in any manner, which is not inconsistent with the public enjoyment of the easement still remains. Upon a discontinuance of the highway the possession of the land reverts to the owner in as full and ample manner as he originally held it. In the opinion of the court, this is not such a taking of property for public use, in the sense of the constitution, as necessarily requires compensation for the same to be made in money. To bring a case within this provision of the constitution, it should be such a taking as divests the owner of all title to or control over the property taken, and is an unqualified appropriation of it to the public."

In *Commonwealth* v. *Tewkesbury*, 11 Met. 55, the owner of the fee of a portion of the beach which helps form Boston harbor, was prosecuted for taking sand and gravel therefrom under a statute which made such taking a penal offense. He defended, and one ground was, that the statute was unconstitutional because it was a taking of his property for public use without making compensation. The court, in an opinion by *Shaw*, Chief Justice, held that although the statute prohibited such taking of sand and gravel with no limitation in regard to time, it was not such a taking of his property as required compensation under the constitution, but a regulation of his use of his own property, necessary, in the interest of the state, to protect the harbor of Boston, and therefore constitutional, and that the respondent was guilty.

The same power which may tax the people to establish and maintain good roads for the common benefit of the public, may tax them and take measures to preserve and increase the common fund of game and fish, from which all

can take, subject to regulations prescribed by the legislature, in the exercise of this power. In *Thorpe* v. *R. R. Co.*, 27 Vt. 140: 62 Am. Dec. 625 and note, this court held that a law passsed subsequently to the granting of the charter of the defendant,—which this court held to be a contract,—compelling the defendant to maintain, for all time, at a considerable expense, suitable fences on the sides of its railroad track, was a proper exercise of this power. That decision has been generally approved and followed. This power has been exercised in regard to almost every species of property and all kinds of rights. It is very elastic, and adjustable to new circumstances and new situations—as flexible and adjustable as the maxim, *Sic utere tuo ut alienum non laedas*, in which it has its origin.

In addition to the cases already cited, the following (which could be added to at pleasure) are good illustrations of the extent and application of this power: *Champers* v. *City of Greencastle*, 138 Ind. 339: 46 Am. St. 390 and note, in which it is said: "The police power of the state extends in the direction of so regulating the use of private property, or of so restraining personal action, as manifestly to secure, or tend to the comfort, prosperity or protection of the community." *People* v. *Wagner*, 86 Mich. 594: 24 Am. St. 141 and note. *People* v. *Ewer*, 141 N. Y. 129: 38 Am. St. 788 and note. *Butler* v. *Chambers*, 36 Minn. 69: 1 Am. St. 638 and note. *State* v. *Heinemann*, 80 Wis. 253: 27 Am. St. 34 and note, in which the police power is defined as the power of "the state vested in the legislature to enact such wholesome and reasonable laws, not in conflict with the state or federal constitution, as may be conducive to the common good." *Health Department* v. *Rector*, (145 N. Y. 32), 45 Am. St. 579 and note. The opinion in the last case is carefully prepared. Among other things, it says: "Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for a compensation for such

disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury it is *damnum absque injuria,* or, in the theory of the law, he is compensated for it by sharing the general benefits which the regulations are intended and calculated to secure. Dillon on Municipal Corporations, 4th ed., § 141 and note 2; *Commonwealth* v. *Alger,* 7 Cush. 83, 84, 86; *Baker* v. *City of Boston,* 12 Pick. 184, 193: 22 Am. Dec. 421; *Clark* v. *Mayor-of Syracuse,* 13 Barb. 32, 36." This was said in upholding a law which compelled the owner of a tenement block erected and in use before the passage of the law to introduce water at quite an expense, so it could be drawn from a faucet on every floor of the block. *Com.* v. *Kimball,* 24 Pick. 359: 35 Am. Dec. 326 and quite extensive note. *People* v. *Arensberg,* 103 N. Y. 388: 57 Am. R. 741 and note.

The framers of the state constitution early began to regulate the right to kill deer and take fish and muskrats, for their protection and preservation for the common benefit of the people, and to destroy noxious wild animals, wolves and panthers, by the payment of bounties with money raised by enforced taxation. These were done by acts passed in March, 1797. 2 Tolman's Comp. Sts. 19 to 24. The constitution in its present form was adopted in 1793. The act for the preservation of fish makes the erection of any dam, hedge, seine, fish garth, or other stoppage, in any water-course, whereby navigation or the passage of fish may be obstructed, a nuisance, and punishes the person erecting the same with a fine. It also establishes a "close season" when trout cannot be taken.

The definition of public waters apparently excludes from the jurisdiction of the State private preserves and posted waters. This is not true. Both are subject to the police power of the State. Any man can be punished if he injures the rights of their owners. Posted waters obtain additional protection by an exercise of the police

power. At common law, the owner could only recover for a trespass upon his land and the invasion of his right of fishery,—generally a very ineffectual remedy. Hence, the right of the riparian owner was rarely regarded, or enforced before the legislature, to protect his right, allowed him, if he complied with the law in regard to posting his premises, to recover of every violator substantial damages. Where the owner availed himself of this law, the legislature evidently considered that the unreasonable destruction of the natural supply of ' fish in the trout brooks and streams would be stayed, and that such streams would need no further protection. Hence, such brooks are excluded from the jurisdiction of the fish and game commissioners. But it reasonably judged that a non-boatable stream, which the riparian owner would not be at the expense of posting, was already depleted of the natural supply of this valuable kind of food and needed to be replenished. It, therefore, allowed the fish and game commissioners to re-stock it at the expense of the people; and, to make that expense profitable to such riparian owner and to the people of the State, the fish must be protected from destruction until they began to reproduce, and then the community should not be burdened, to protect his right beyond what the common law furnished, for five years longer. By providing that such waters should be waters over which the State has jurisdiction, it did not take away such riparian owner's right to maintain trespass, against every one who should enter without his license upon his premises and catch fish from the non-boatable stream thereon. The action of the fish and game commissioners in stocking the stream and posting it, presumably would enure to the benefit of such riparian owner, and all other riparian owners on that and other connected streams. Whether it would or not, the constitution clearly empowered the legislature to pass such laws as, in its discretion, it might judge would be for the common benefit of the people of the State.

Some one has suggested that the State had no right to send the fish and game commissioners upon Mr. Hale's land to stock the stream. The law is paramount to his property and rights, within the inhibitions of the State and national constitutions. As well might he contend that the law could not send its officer upon his land to arrest him for a criminal act, or to attach his property at the suit of a creditor. On any view, even if the owner of the land over which the stream flows had been the violator of the law and was under prosecution, this statute must be held constitutional and enforceable; and much more against this respondent, who clearly had no right upon Mr. Hale's premises, nor the right to take fish from the stream of water flowing thereon.

*Judgment affirmed and cause remanded to the city court.*

*Thompson,* J., dissents.